IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-504-FL

| | | |
|---|---|---|
| TIMOTHY and SHARON WIWEL; and<br>E.W., a minor, by and through her parents<br>Timothy and Sharon Wiwel, | ) )<br>) )<br>) | |
| | ) ) | |
| Plaintiffs, | ) ) | |
| | ) ) | ORDER |
| v. | ) ) | |
| | ) ) | |
| IBM MEDICAL AND DENTAL<br>BENEFIT PLANS FOR REGULAR<br>FULL-TIME AND PART-TIME<br>EMPLOYEES, | ) )<br>) )<br>) )<br>) ) | |
| | ) ) | |
| Defendant. | ) | |

This matter comes before the court on plaintiffs' motion for summary judgment (DE 44) and

defendant's motion for judgment on the settled administrative record and plan document (DE 38).

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States

Magistrate Judge Robert T. Numbers, II, entered a memorandum and recommendation ("M&R"),

wherein it is recommended that the court grant plaintiff's motion, deny defendant's motion, and

award benefits and attorney's fees in plaintiff's favor. Defendant timely filed objections to the

M&R, and the issues raised are ripe for ruling. For reasons that follow, the court remands the action

to defendant for further proceedings.

## BACKGROUND

Plaintiffs initiated this action September 25, 2015, seeking review of defendant's final

decision denying health insurance benefits under an employee benefit plan arising in conjunction

with plaintiff Timothy Wiwel's employment with International Business Machines Corporation ("IBM"). On May 27, 2016, plaintiffs moved for summary judgment, contending that procedural errors infecting defendant's decision-making process rendered the decision abuse of discretion in violation of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). Also on May 27, 2016, defendant moved for judgment on the settled administrative record and plan document, contending that procedural deficiencies complained of by plaintiffs do not constitute violation of ERISA. Plaintiffs seek award of benefits. Defendant seeks affirmation of its decision to deny benefits or, in the alternative, remand for further proceedings.

In support of their motions, all parties rely upon documents they style as the "administrative record," which includes the medical evidence relating to plaintiff E.W.'s conditions and treatment history as well as documents evidencing procedural history of defendant's decision to deny coverage for E.W.'s treatment beyond March 10, 2014.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows: Defendant is a self-funded employee benefit plan organized pursuant to ERISA. Defendant is organized as an independent legal entity, but the purpose of its existence is to administer employee benefit plans given as part of IBM's employee compensation package. Further, the record discloses that defendant's highest level administrative body, a three-person committee, retains final authority to decide all claims arising under IBM's benefit plan. Nonetheless, defendant employs a specialized and privately operated outside firm known as United Behavioral Health, which does business under the name "Optum," to perform initial evaluation of employees' claims. Similarly, when the judgment of a medical professional is required to evaluate a disputed claim, defendant employs Independent Peer Review

2

Organization ("IPRO"), also a private organization, to perform claims evaluation at its highest level of internal appellate review.

Plaintiffs Timothy and Sharow Wiwel adopted plaintiff E.W. from a Russian orphanage in January 1999, when E.W. was seven months old. No later than 2006, E.W. began to exhibit mental health problems, and she received treatment on an outpatient basis for medical issues including attention deficit hyperactivity disorder ("ADHD"), depression, anxiety, isolation, and avoidance.

In February 2013, plaintiff E.W.'s condition worsened, and she was admitted to Holly Hill Hospital in Raleigh, North Carolina after she engaged in self-cutting on her arms and reported suicidal ideation. In March 2013, E.W. was admitted to the University of North Carolina Hospital for severe depression and further suicidal ideation and self-cutting. Following these events, E.W. began psychological, psychiatric, psychotherapeutic, neuropsychotherapeutic, dialectical behavior therapy treatments, and medication management.

In October 2013, E.W. was evaluated by Dr. Patti Zordich ("Dr. Zordich"), who, after a clinical interview, concluded that E.W.'s unwillingness to sign a no-suicide contract or cooperate with outpatient therapy warranted elevating E.W.'s treatment to inpatient hospitalization and evaluation. Also in October 2013, E.W. was hospitalized at WakeMed Hospital ("WakeMed"), again for suicidal ideation and self-cutting, which conduct plaintiffs characterize as a genuine suicide attempt. Defendant disputes characterization of these events as a suicide attempt, but, in any event, E.W.'s self-inflicted wounds were sufficiently severe to require stitches.

Following her release from WakeMed, plaintiffs Timothy and Sharon Wiwel committed plaintiff E.W. to Strategic Behavioral Center in Garner, North Carolina, which is a psychiatric hospital for adolescent patients. While in the care of Strategic Behavioral Center, E.W. was

3

evaluated by Dr. Helen Courvoisie ("Dr. Courvoisie") and Katherine Engler ("Engler"), a marriage and family therapist, and each recommended that E.W. be admitted to a psychiatric residential treatment facility. Aditionally, Mitchell Odom ("Odom"), a registered nurse at Carolina Partners in Mental Healthcare who followed E.W.'s medical progress since March 2013, found that treatment given prior to E.W.'s episode in Feburary 2013, resulted in partial improvement at best. Accordingly, Odom recommended that E.W. be placed in a long-term care facility to receive intensive treatment. Finally, plaintiffs consulted with Susan Van Benschoten ("Benschoten"), a registered nurse working as a case advocate for Optum, who, based on her review of E.W.'s medical records, recommended that E.W.'s residential treatment proceed for nine to 12 months, which recommendation was later reduced to a period of six to nine months.

In response to the foregoing recommendations, plaintiffs, with the help of Benschoten, sought out an appropriate residential treatment center for adolescent patients. Plaintiffs identified La Europa in Salt Lake City, Utah, as a suitable facility, and Benschoten agreed that La Europa offered appropriate services for E.W.'s needs. Accordingly, defendant approved coverage for E.W. to receive treatment at La Europa beginning February 4, 2014. Between February 4, 2014, and March 10, 2014, defendant approved coverage for E.W.'s treatment at La Europa on a temporary basis repeatedly for a few days at a time subject to reevaluation of her medical condition prior to each renewal.

Even after admission to La Europa, plaintiff E.W. continued to suffer mental health problems. For example, February 5, 2014, E.W. reported hearing voices telling her to kill herself. Such thoughts continued throughout February 2014, and La Europa staff opined that, in light of her depression, thoughts of suicide, and thoughts of self-harm, E.W. remained a danger to her own

4

safety. Throughout March 2014, E.W. continued to have thoughts of self-harm, but she did not engage in self-cutting or other destructive behavior. Plaintiffs interpret this positive development as the result of La Europa's highly structured setting, which they contend renders self-harm impossible by ensuring that patients lack access to sharp objects and face punishment for attempts to engage in self-harm. Defendant, on the other hand, considers E.W.'s refraining from self-harm as evidence of improved psychological health.

In or around early March 2014, Optum engaged Dr. James W. Feussner ("Dr. Feussner") as a consulting examiner to review E.W.'s progress up to and including March 10, 2014. In preparation for his report, Dr. Feussner considered E.W.'s clinical information and conducted a telephonic conference with La Europa staff. On the basis of these materials, Dr. Feussner concluded that E.W.'s psychological problems were no longer sufficiently severe to warrant further treatment at La Europa or other residential care facility. Dr. Feussner's report does not elaborate upon what evidence he found dispositive; rather, the report states only that "[t]aking into consideration [information obtained at telephonic conference], along with the additional information given by the provider" extending approval for residential care beyond March 10, 2014, was unwarranted in E.W.'s case. On the basis of Dr. Feussner's determination, defendant noticed its decision to deny further coverage for E.W. to receive treatment at La Europa.

After March 10, 2014, plaintiffs Timothy and Sharon Wiwel decided to pay out of pocket to allow plaintiff E.W. to continue treatment at La Europa, where she remained until August 31, 2014. During the period following March 10, 2014, La Europa's records reflect that E.W. continued to experience feelings that she would be better off dead, and she continued to have thoughts of self-harm. In May 2014, E.W. remembered, for the first time, that she had been raped when she was

5

younger, and during the remaining months spent at La Europa, E.W. began to acknowledge and confront her sexual trauma. By August 31, 2014, La Europa staff determined that her condition had improved sufficiently to discharge E.W. from the program, noting, in particular, that E.W. no longer expressed feelings that she would be better off dead.

During the time plaintiff E.W. continued her treatment at La Europa after March 10, 2014, plaintiffs Timothy and Sharon Wiwel appealed defendant's initial decision to deny coverage. In support of their appeal, plaintiffs submitted photographs of E.W.'s injuries resulting from self-harming behavior; a May 1, 2014, letter from Dr. Zordich addressing Dr. Zordich's October 2013, recommendation that E.W. be admitted for in-patient evaluation; an undated letter from Odom; a January 29, 2014, letter from Dr. Courvoisie and Engler; E.W.'s medical records from La Europa dated January 29, 2014, through July 15, 2014; and E.W.'s clinical records from La Europa dated April 2, 2014, through July 11, 2014. Each of the foregoing materials, in varying degrees of detail, recounted the nature of E.W.'s psychological problems or otherwise specifically recommended that E.W. receive residential care.

To assess plaintiffs' level one appeal, defendant engaged Dr. Neal R. Satten, M.D. ("Dr. Satten"), who is a board certified psychiatrist and was the associate medical director at Optum. By letter dated August 14, 2014, Dr. Satten noticed plaintiffs of his decision to deny their appeal. Dr. Satten's letter provides no explanation of his reasons for concluding that E.W. no longer needed residential care after March 10, 2014, and his letter repeats verbatim the language of the initial denial.

Following denial of their level one appeal, plaintiffs sought a level two appeal from defendant's administrative panel. In addition to materials submitted in support of their level one

6

appeal, plaintiffs submitted medical records from La Europa and other facilities extending through September 2014. Because it understood plaintiffs' entitlement to benefits to turn on plaintiff E.W.'s medical history and no one on the administrative panel possessed medical expertise, defendant referred the level two appeal to IPRO for independent review. In turn, IPRO submitted the available evidence to a licensed psychiatrist whose name does not appear in the record. This reviewer's findings summarized briefly the evidence described above, and relied on the American Psychiatric Association Practice Guidelines for the Treatment of Patients with Major Depressive Disorders ("APA guidelines"), which counsel that practitioners should use the "least restrictive level of care for safe and effective treatment" available in treating adult patients with major depressive disorder. The IPRO report does not set forth reasons to conclude that E.W.'s improved behavior would persist should she be discharged from La Europa, nor does the report explain what medical evidence was found determinative or why.

Finally, where ERISA mandates that a denial of benefits be subjected to no more than two levels of internal appeal, defendant's decision based upon the IPRO report was final. This action followed.

## DISCUSSION

A.    Standard of Review

At hearing before the magistrate judge and in their opposing motions, the parties indicated some confusion as to the proper procedural mechanism through which to resolve their ERISA claims. (DE 38, DE 42, DE 79 at 11–13). The M&R recommends adjudicating the parties' motions under the standards governing summary judgment pursuant Federal Rule of Civil Procedure 56, and neither party objects to this aspect of the M&R. (See generally, Def.'s objections, DE 75).

Accordingly, while recognizing that some courts in the Fourth Circuit have characterized summary judgment as an imperfect procedural mechanism through which to conduct review of a decision denying employee benefits under ERISA, where there exists no genuine dispute of material fact in this case, summary judgment is procedurally adequate to adjudicate the parties' claims. See e.g., Weisner v. Liberty Life Assurance Company of Boston, __ F. Supp. 3d. __, 2016 WL 5335794, at *5 (D. Md. 2016) (recognizing imperfection, but utilizing summary judgment standard in case involving an undisputed administrative record); Hairston v. Liberty Life Assurance Co. of Boston, No. 1:13cv656, 2015 WL 3675031, at *4 (M.D.N.C June 12, 2015) (same).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the non-movant then affirmatively must demonstrate a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

This court has jurisdiction under 29 U.S.C. § 1132(a) to review defendant's final decision denying benefits. Under ERISA, if an employee benefit plan grants discretion to an employer to administer a benefit plan, the court's inquiry on review is limited to a determination whether the administrator's decision to deny benefits constituted abuse of discretion. Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000). The parties agree that the

8

documents of relevance here grant discretion to defendant to administer IBM's employee benefit plan. Therefore, the abuse of discretion standard applies to this review. See id.

Under the abuse of discretion standard, the court will not disturb the determination of a plan administrator if the determination is reasonable. Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 326 (4th Cir. 2006). A plan administrator's "decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. at 322. "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotations omitted). The standard is met by "more than a mere scintilla of evidence but . . . less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

To evaluate whether a plan administrator's decision is reasonable, courts in the Fourth Circuit consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent wit other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342–43). Not all factors will be relevant in every case. See Helton v. AT&T Inc., 709 f.3d 343, 357 (4th Cir. 2013).

To assist it in its review of defendant's denial of benefits, the court may "designate a magistrate judge to conduct hearings . . . and to submit . . . proposed findings of fact and recommendations for the disposition [of the motions for summary judgment]." See 28 U.S.C.

9

§ 636(b)(1)(B). The parties may object to the magistrate judge's findings and recommendations, and the court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. § 636(b)(1). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.     Analysis

Defendant objects to the M&R on the ground that the October 3, 2014, final decision adopting the IPRO report and denying plaintiffs' application for coverage was supported by substantial evidence and did not constitute abuse of discretion as contemplated by ERISA. Defendant does not object to the finding that where defendant both funds its employee benefit plan and adjudicates employees' claims, it operates under a conflict of interest as contemplated by the eighth Booth factor. Additionally, while defendant's contentions necessarily embrace an objection to the finding under the sixth Booth factor that defendant failed to comply with the substantive standards of ERISA, that finding follows from analysis of the third and fifth factors, and does not constitute an independent basis for the recommendation. Therefore, where defendant's objections

10

relate to the analysis in the M&R discussing the third and fifth Booth factors, this court may address defendant's decision considering only those two disputed factors. Orpiano 687 F.2d at 47.

With respect to the third Booth factor, "the adequacy of the materials considered to make the decision and the degree to which they support it[,]" Booth, 201 F.3d at 342, defendant's final decision is deficient for a number of reasons. First, there is no indication in the IPRO report that the reviewer considered opinion evidence from Dr. Zordich, Odom, Benschotten, Engler, or Dr. Courvoisie. (See DE 34 at 473–76). Additionally, the IPRO report did not address E.W.'s self-report that the reason she refrained from self-cutting after March 10, 2014, was that she did not want to suffer consequences imposed at La Europa. (Id.; see DE 32 at 391 (nurse memorializing E.W.'s statement that self-cutting ceased because E.W. did not want consequences imposed at La Europa)).

Finally, the IPRO reviewer rested the recommendation to deny benefits, in part, on its reading of the APA Guidelines. It was error for the reviewer to rely on the APA guidelines as the primary source of medical authority where the APA guidelines, by their own terms, do not apply to children. (DE 34 at 489). Indeed, the APA guidelines direct the reader's attention to the American Academy of Child and Adolescent Psychiatry's Practice Parameter for the Assessment and Treatment of Children and Adolescents with Depressive Disorders ("AAPCA guidelines") as the correct source of medical authority in cases involving children and adolescents suffering from depressive disorders. (Id.). Therefore, where the IPRO reviewer failed to consider the AAPCA guidelines as directed by the APA guidelines, it cannot be said that "the materials considered to make the decision" were adequate. See Booth, 201 F.3d at 342.

With respect to the fifth Booth factor, "whether the decision-making process was reasoned and principled[,]" id., defendant's final decision exhibits even greater deficiencies. First, the IPRO

11

opinion does not explain why opinion evidence favoring denial of benefits, which, apparently consists entirely in the opinion of Dr. Feussner, was found to outweigh opinion evidence favoring plaintiffs' position. (See DE 34 at 473–76). Second, if there exists an explanation for the IPRO reviewer's decision to use the APA guidelines applicable to adults to decide a case involving a child, nowhere in the record does such explanation appear. (Id.)

Finally, and most importantly, where the IPRO opinion rests on its assessment that E.W.'s self-cutting behavior and thoughts of suicide were subdued by March 10, 2014, it fails entirely to address a conspicuous confounding variable, namely, the influence that La Europa, itself, may have brought to bear upon E.W.'s behavior. That is, where the evidence of record demonstrates that before her admission to La Europa, E.W.'s behavior was destructive, and while in residency at La Europa, E.W.'s behavior was stable, (see e.g., DE 32 at 391 (noting, among other things, E.W. denying suicide plan or intent as of February 28, 2014), the IPRO opinion does not adequately state reasons to conclude that in the absence of La Europa's care, E.W.'s behavior would have remained stable after March 10, 2014.

Relatedly, the IPRO opinion fails to address trends evident in E.W. behavior over time. Specifically, before admission to La Europa, where E.W.'s symptoms progressed from difficulty concentrating, to depression, to self-cutting and suicidal ideation, the time-dependant arc of E.W.'s development was negative. (See DE 32 at 438 (undisputed summary of E.W.'s behavior and treatment history)). While E.W. resided at La Europa, this trend reversed. (See id. at 391). Nonetheless, in finding that E.W. safely could have left La Europa March 10, 2014, the IPRO reviewer offered no reasons to conclude that removing E.W. from the care of La Europa would not return E.W.'s progress to its prior dynamic of decline. (DE 34 at 473–76). Thus, for the foregoing

12

reasons, it is evident that defendant's decision to deny plaintiffs' application for benefits was not the result of a reasoned and principled decisionmaking process as required by ERISA. See Booth, 201 F.3d at 342.

In support of a contrary argument, defendant contends that substantial evidence did, in fact, support defendant's decision. In particular, defendant contends that the opinion of Dr. Feussner, which found that by March 10, 2014, "E.W. was not displaying the overt problems for which she was admitted" and that, according to a La Europa representative, "E.W. may behave well with the appropriate structure and supervision[,]" (Def. Br., DE 75, at 7), constituted an adequate basis to conclude that E.W. no longer needed residential care. From these observations, several issues emerge. First, by its own terms, Dr. Feussner's letter does not conclude that E.W. will or likely will "behave well [outside La Europa] with the appropriate structure and supervision[;]" rather, Dr. Feussner concludes only that E.W. may behave well outside the care of La Europa. This conjecture, does not constitute substantial evidence in support of the logically stronger proposition that treating E.W. at La Europa was no longer "medically necessary" after March 10, 2014. Similarly, Dr. Feussner's observation that "E.W. was not displaying the overt problems for which she was admitted" does not constitute substantial evidence that treatment at La Europa was not medically necessary because, as set forth above, it does not address the confounding variable that residency at La Europa may have been a necessary predicate to E.W.'s improved behavior.

Further, E.W.'s treatment plan, which was developed by Optum staff in light of all of E.W.'s past medical history, concluded that the severity of E.W.'s condition warranted at least nine months of treatment, an estimate later reduced to no less than six months. (DE 32 at 277). Dr. Feussner's letter does not address the treatment plan, nor does his letter explain why prior assessments of

13

E.W.'s needs were inaccurate or in what manner E.W.'s circumstances had changed to warrant a treatment period shorter than six months.

Moreover, in support of his conclusion that E.W. no longer needed residential care after March 10, 2014, Dr. Feussner cites statements given by La Europa staff, which he characterizes as La Europa's "admission" that E.W. properly could be treated at a lower level of non-residential care. However, defendant has not demonstrated that a consulting examiner may treat statements of a care facility's treatment staff as having the nature of an admission conclusively establishing a fact without further inquiry into the basis in substantial evidence for the staff member's statement. See Donovan, 462 F.3d at 326 (requiring that decisions under ERISA be supported by substantial evidence); cf. Fed. R. Civ. P. 36(a) (only a party may admit a fact for purposes of treating the matter admitted as conclusively established).

Even assuming he considered the La Europa representative's statements, not as a formal admission, but simply for its weight as a medical opinion, Dr. Feussner's opinion still fails to support defendant's conclusion that residential care was unnecessary after March 10, 2014. Specifically, from the text of Dr. Feussner's letter, it appears that statements of La Europa's representative constituted the only evidence that E.W. no longer needed residential care. (DE 32 at 385). Nonetheless, Dr. Feussner remarked expressly that the individual with whom he spoke appeared unfamiliar with E.W.'s case, and no evidence appears in the record that Dr. Feussner undertook independently to verify information received at conference. (Id.). Whether this failure to verify is characterized as undermining Dr. Feussner's letter as a source of substantial evidence or, rather, as a failure to explain why a conspicuous defect in the evidence was found unimportant,

14

the result is the same: defendant's reliance upon Dr. Feussner's recommendation was unprincipled in derogation of the fifth <u>Booth</u> factor.  <u>See</u> <u>Booth</u>, 201 F.3d at 342.

In an attempt to minimize the legal effect of deficiencies noted above, defendant argues that "consulting physicians do not discuss their rationale at length like judges, and there is no requirement that they do so."  (DE 75 at 13).  However, in the same regulation defendant cites in support of the foregoing proposition, it is made plain that defendant must set forth "the specific reason or reasons" for any adverse benefits determination.  <u>See</u> 29 C.F.R. § 2560.503-1(g) ("The notification [of benefits denial] shall set forth, in a manner calculated to be understood by the claimant . . . [t]he <u>specific reason or reasons</u> for the adverse determination[.]") (emphasis added).  Additionally, defendant's plan document reaffirms this obligation expressly in its text.  (DE 32 at 188 ("[N]otice will include (1) the specific reasons for the decision . . .")).  Therefore, even assuming, as defendant suggests, that consulting physicians are disinclined to explain their rationales, this observation is irrelevant because, where a medical professional's opinion may affect a claimant's rights under an employee benefit plan, the level of explanation required of such an opinion is governed by federal law.

More fundamentally, however, the requirement that a decision affecting the rights of an ERISA claimant be well explained derives, not only from regulatory fiat, but also from ERISA's provision of judicial review.  <u>See</u> 29 U.S.C. § 1132.  That is, the nature of judicial review requires that the record of decision be adequate for a court to determine what evidence was considered and what reasoning was employed.  <u>See</u> <u>T-Mobile south, LLC v. City of Roswell, Ga</u>, 135 S.Ct. 808, 815 (2015) ("[C]ourts cannot exercise their duty of substantial-evidence review unless they are advised of the considerations underlying the action under review"); <u>see also</u> <u>Radford v. Colvin</u>, 734 F.3d

288, 295 (4th Cir. 2013) (same). In particular, absent a robust requirement that medical sources and plan administrators explain their reasoning, the court would have no way to distinguish a principled and correct denial of benefits from a bad faith denial in violation of ERISA. Therefore, where Dr. Feussner's opinion fails to explain his recommendation in the manner described above, the IPRO reviewer's reliance on that opinion and defendant's subsequent adoption of the IPRO opinion was unprincipled. See Booth, 201 F.3d at 342.

Next, defendant argues that materials not adequately addressed in the IPRO decision are minimally relevant because the opinions of Dr. Zordich, Odom, Engler, and Dr. Courvoisier were formed several months earlier than the opinion of Dr. Feussner. From this observation defendant concludes that because the foregoing opinions were formed earlier, those opinions are less probative of E.W.'s medical condition than the later opinion of Dr. Feussner. This argument fails for at least two reasons. First, a post hoc rationalization by counsel of a plan administrator's decision does not satisfy ERISA's requirement that the plan administrator set forth the specific reasons for a denial of benefits. See 29 C.F.R. § 2560.503-1(g)(1) ("The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination . . . . [t]he notification shall set forth . . . [t]he specific reason or reasons for the adverse determination."). That is, even if counsel's assessment of the medical evidence proves to be a permissible finding, it is incumbent upon defendant, as the plan administrator, to make that finding if it is warranted. Second, in light of the ongoing nature of E.W.'s psychological issues – beginning no later than approximately eight years before defendant's decision to deny benefits – the record does not compel a conclusion that a medical opinion formed in October 2013, is less reliable than an opinion formed in March 2014, by virtue of the passage of time. At minimum, if there exist reasons to conclude that Dr. Feussner's

16

March 10, 2014, opinion is more reliable than other available opinion evidence, it is defendant's duty to state those reasons on the record. See id.

Finally, defendant attempts to salvage its apparently erroneous reliance on APA guidelines applicable to adult patients by pointing out that both the APA guidelines and the plan documents themselves establish similarly worded guidelines. Specifically, the APA guidelines recommend using "the least restrictive level of care for safe and effective treatment[,]" (DE 34 at 475), and the plan documents require using "the least intensive level of appropriate care for [a patient's] diagnosed condition." (DE 32 at 121). Thus, defendant contends, even if its use of the APA guidelines was in error, the plan documents require defendant to reach the same result, even though the guidelines applicable to children suggest a level of care that may be greater than that recommended under the adult guidelines.

This argument fails because it does not account for the definition of "medical necessity" used in defendant's plan documents. Specifically, the plan documents define the term "medical necessity" by reference to the standards employed by relevant medical authorities. (DE 32 at 122 (defining medical necessity as "the least intensive level of appropriate care for [a] diagnosed condition in accordance with . . . [g]enerally-accepted psychiatric and mental health practices."). Therefore, where the IPRO reviewer consulted the APA guidelines, which, in turn, direct the reader to consult the AACAP guidelines, the reviewer should have applied the AACAP guidelines to determine the level of treatment medically necessary for E.W.'s care. Thus, defendant's argument that the requirements of the plan and the requirements of the AACAP collapse into the same standard fails.

17

In sum, defendant's decision must be reversed because, in light of the <u>Booth</u> factors discussed above, the decision was an abuse of discretion.

C.     Remedies

Where a district court reverses the decision of fiduciaries designated pursuant to an employee benefit plan covered by ERISA, generally, the proper course is to "remand to the trustees for a new determination[.]" <u>Bernstein v. CapitalCare, Inc.</u>, 70 F.3d 783, 788 (4th Cir. 1995). "However, remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." <u>Helton v. AT&T Inc.</u>, 709 F.3d 343, 360 (4th Cir. 2013). More precisely, district courts should award benefits rather than remand for further proceedings when an ERISA plan administrator demonstrates "a manifest unwillingness to give fair consideration to evidence that supports the claimant." <u>Id.</u> (quoting <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 856 (3d Cir. 2011)).

In the instant matter, there is no doubt that defendant abused its discretion by its failure to consider all relevant evidence and explain its decision on the record. However, this isolated failure does not demonstrate defendant's "manifest unwillingness to give fair consideration to evidence that supports the claimant." <u>See id.</u> To be sure, it is troubling that defendant apparently rested its decision to deny coverage for plaintiff E.W.'s treatment solely on Dr. Feussner's letter, the only source of opinion evidence favoring denial of coverage, without addressing conspicuous defects in that evidence or explaining why other evidence was discounted or ignored. Nonetheless, inadequate though it was, the IPRO report, which defendant ultimately adopted as its decision, does not represent a total abdication of defendant's duty to consider relevant evidence and explain the basis for its decision to deny benefits. Moreover, the evidence of record does not affirmatively rule out the possibility that defendant's determination was correct. Indeed, the evidence demonstrates that

E.W.'s behavior had improved by March 10, 2014, even though, as set forth in detail above, defendant did not establish a logical link between that improvement and the conclusion that E.W. no longer needed residential care.

Therefore, for the foregoing reasons, the court rejects the recommendation of the M&R to reverse for an award of benefits. The proper remedy is remand for the limited purpose of allowing defendant an opportunity to clarify or reconsider its decision to deny plaintiffs' application for benefits. As ERISA requires, defendant's new decision and explanation therefor must demonstrate consideration of all relevant evidence of record, and if there exists conflicting evidence, defendant must explain the weight given to each source of evidence and set forth its reasons for such assignment of weight. See 29 C.F.R. § 2560.503-1(g). Should procedural deficiencies noted in this order persist in future action for administrative review, an award of benefits may be warranted.

Finally, where the court finds abuse of discretion and remands for further proceedings, the decision to award attorney's fees in ERISA cases is "completely within the discretion of the district court." Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1028 (4th Cir. 1993). The Fourth Circuit has adopted a five-factor test to guide a court's discretion in determining whether an award of attorney's fees is warranted under ERISA. The five factors are:

(1)     degree of opposing parties' culpability or bad faith;

(2)     ability of opposing parties to satisfy an award of attorneys' fees;

(3)     whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4)     whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5)     the relative merits of the parties' positions.

19

Id.

In the instant matter, the court finds multiple factors in favor of an award of attorney's fees. First, defendant's abuse of discretion exhibits a significant degree of culpability where it failed to discharge its known duty to set forth "the specific reason or reasons" for denying benefits. 29 C.F.R. § 2560.503-1(g). Second, there appears in the record no cause to doubt that defendant has the ability to satisfy an award of attorney's fees. Third, an award of attorney's fees likely will deter defendant and other administrators similarly situated from engaging in procedural deficiencies set forth above. Fourth, where plaintiffs correctly identified shortfalls in defendant's decision to deny benefits, the relative merits of the issues presented favor plaintiffs' position. Therefore, an award of attorney's fees is proper under the first, second, third, and fifth Quesinberry factors. See 987 F.2d at 1028.

Plaintiff is directed to file a statement of fees and costs no later than April 18, 2017. Defendant's response, if any, is due 14 days after plaintiffs' submission, whereupon the court will enter such further order as is warranted to close this case.

## CONCLUSION

For the foregoing reasons, the court REJECTS the recommendation in the M&R, GRANTS IN PART defendant's motion (DE 38), DENIES plaintiff's motion (DE 44), and REVERSES and REMANDS to defendant for further proceedings consistent with this order. Plaintiff is DIRECTED to file a statement of fees and costs no later than April 18, 2017. Defendant's response, if any, is due 14 days after plaintiffs' submission, whereupon the court will enter such further order as is warranted to close this case.

SO ORDERED, this the 29th day of March, 2017.

LOUISE W. FLANAGAN
United States District Judge